No, I don't know if it's an elk or a hake. I don't know if it's an elk or a hake. It's a hog. A hog probably. It might be a hog. I'm going to have to start calling you a professional speaker. No, I'm a professor in a French class here. Mr. Sturbeck. Good morning, your honors. May it please the court. Mr. Hauge should prevail in his appeal because the district court entered an injunction that was wrong as a matter of law and abused its discretion in finding Mr. Hauge in contempt of the 2001 settlement order. The district court abused its discretion for three reasons. Because Mr. Hauge's conduct did not violate the 2001 settlement agreement. If Mr. Hauge's conduct did violate the 2001 settlement agreement, the conduct was not done knowingly. The record does not support a finding of knowing conduct violating the order. And third, the injunction that was entered by the district court, and this is critical, far exceeds the agreement between the parties in 2001. What role does the California jury verdict have in our consideration? So the California jury verdict is certainly informative of what's going on in Virginia, your honor, because the same operative facts are at issue in California. The district judge in Virginia relied on the same allegations that were presented to the jury after a 12-day jury trial in California and rejected by the jury. The judge in his order at JA-7 relies on, specifically for knowledge. Is the trade secrets case in California, does it involve the methodology of manufacturing about which they complain? That is the allegation. That has to be the allegation. Does it involve the employees that's asserted were taken from the company? Absolutely yes, your honor. The two employees who were hired by Mr. Hauge from Energy Recovery, Mr. Nillo and Mr. Coyle, were defendants, named defendants in the California state court case and were similarly vindicated, exonerated of the charges of misappropriation. I didn't mean to interrupt Judge Wallach's question. I thought I was adding on to it. I want you to answer his question as well. Absolutely. I'm sorry to be clear. The question is whether the same operative facts or those individuals... The question was the manufacturing process that was supposedly misappropriated. Yes, absolutely. So the allegations are that Mr. Hauge hired these two individuals from Energy Recovery to his new formed company, Isobarics, for the express purpose of misappropriating the trade secrets. These, quote, proprietary technology, the manufacturing processes. Can the federal court in Virginia, though, simply disagree with the jury verdict of the state court in California? Not on the record before us, Your Honor. The record for this case does not support the clear and convincing evidence requirement that is necessary for the judge in Virginia who have reached his conclusion and found Mr. Hauge incontent. Now, how would you categorize the effect of the California jury verdict on the Virginia case? Because of the similarities, the effect will be one of collateral estoppel at a minimum and res judicata once the decision becomes final from the California district court. Because Energy Recovery has made the same allegations... So what is it that's not final? The damages? What's not final about the California... It's available for appeal now. So the jury has rendered its verdict and certainly Energy Recovery could appeal. So really what you're saying goes to the question of intent to violate the 2001 agreement. Absolutely, and that would be the second point, Your Honor. Not only does his conduct, would we submit, not violate the order, but even if you were inclined to find that it did violate the order, we would certainly argue that it does not. He did not knowingly violate the order. And for two points, we would rely on that. Number one, the agreement between the parties entered in 2001 included a clear non-compete agreement. Two years, Mr. Hauge cannot compete. He waits his two years. After that, he develops new technology. Also, he's expressly allowed to do under the terms of the agreement. He develops this new technology. He takes it to Energy Recovery. He tells them he's got this new patent. He asks them if they want to work with him on it. They consider it, and they decline. They wish him success and send him on his way. Three years later, he hires Mr. Coyle and Mr. Nillo from Energy Recovery, and at that point, the litigation commences, the state court California case and the contempt proceedings in Virginia. The settlement agreement that the court adopted, it had a two-year expiration date. Is that only on the non-compete clause or on the entire settlement agreement? The two years prohibited... It's a non-compete agreement. Mr. Hauge was not permitted to practice it, sir. As I read it, following up on Ted Rand, there are only two things that are in there. That is, you have to transfer all your stock, right title, and interest, and everything, and you can't compete for two years. And we pay you a certain amount of money, $150K in two batches. So if that's done, if the transfer of stock transfer takes place and the payment takes place, the only other thing left is the two-year non-compete. Is that not correct? That is correct, Your Honor. What Energy Recovery is alleging as the breach of the agreement, the contempt, is that despite the fact that Mr. Hauge conveyed this proprietary technology, that he's now using it today and he's no longer entitled to do that. We would submit that the record as it stands simply doesn't support that. The district court made no findings as to what the proprietary technology was, whether it's trade secret or patent. That's why you're arguing for constraint. But this is a contempt action, and so we presume that the court has a good background on what happened earlier and can place these new facts in the context of the earlier trial. Why shouldn't we give deference to the court's placing of this conduct within the context of what happened earlier? Certainly the court is entitled to deference. The standard of review for the contempt order is abuse of discretion, but this case is a little bit different than a typical contempt case where perhaps there's been already an adjudged infringing product, there's been repeated violations of an injunction. This is a case that has roughly 12 years between an early settlement where the parties enter into a settlement agreement, the parties negotiate with counsel the terms of the agreement, and then they present that agreement to the court who blesses it. Twelve years go by, and Energy Recovery shows up and says to this district judge, Your Honor, you may not remember us, but 12 years ago we had a case in front of you that we settled and you entered a settlement order. Well now, the defendant in that case, Mr. Hogue, is violating the order. Now what they didn't do was find the evidence, and the judge didn't find the evidence of what the proprietary technology was or what Mr. Hogue's actions were that would violate that proprietary technology. And the court, the district court, if we read it... But the record does show there's testimony from it or an expert opine that the same ceramic process was being used, that this was practically the same manufacturing process, correct? But the district judge didn't make a finding that that was precisely the basis of his conclusion. And that same expert presented the very same testimony in the California case that was rejected by the California jury. He made those same arguments that Mr. Hogue's process necessarily uses some proprietary technology and that was rejected by the California jury. I would submit to you that the record that stands in front of us is even less than the record that was presented in California and could not possibly rise to the level of clear and convincing evidence that would be necessary for the district judge to have found Mr. Hogue in contempt. Another point I would urge you to consider, Your Honors, is the scope of the injunction entered by the district judge. And here's really where the error becomes most apparent. The district judge, in his opinion, did not specifically find which technology Mr. Hogue... the proprietary technology that Mr. Hogue was purportedly using. He did not specifically find what conduct was violative because the district judge didn't care. The scope of the district judge's order is that Mr. Hogue is forever barred from manufacturing or selling any pressure exchanger. Not pressure exchangers limited to proprietary technology transferred to ERI, but rather any pressure exchanger technology. So for the district judge, it was sufficient for him to find that, in his opinion, that Mr. Hogue was using pressure exchanger technology. So is this a new form of relief? Is this an injunction? What effect does that have on the prior order? Are you talking about modification, Lody? We are absolutely talking about modification in our estimation, Your Honor. It's possible that the court could view this as an entirely new injunction, if it likes. Either way, jurisdiction is still proper under Section 1292. The court, the 2013 order from the district court, specifically used the words, enjoins. So it intended to enjoin Mr. Hogue's conduct. And the scope of the injunction is so much broader than that which the parties had previously agreed to in 2001 that we would submit to you it cannot stand. And one final matter, before I preserve my time, is that under Rule 65D, this court has de novo review over the injunction to determine whether it lacks the specificity that would be required by that rule. I will preserve the time. Thank you, Mr. Sterba. Mr. Nuna. Good morning, Your Honors. May it please the court. Steven Nuna on behalf of Energy Recovery. Your Honors are at a crossroads here. Down one path you have Mr. Hogue who asks you to look beyond the record in this case to recreate, reinvent, and reinforce an unfortunate record that does not support excusing him from violating the district court's order. Allow him to... This most recent, let's call it the injunction of the Virginia court, it prohibits Mr. Hogue from any type of activity, seems to me, so broad that it prohibits him from any type of activity involving these type of power exchangers, energy exchangers. Show me what in the original consent order or the order that adopted the settlement agreement contains the support for that type of ruling. Well, the support, Your Honor, is twofold. It is in the original agreement which was enforced by the order. Show me where in those... Yes, sir, Your Honor. I'm looking, if you will, at the language of the order that says, number four, on the first paragraph, and all other intellectual property and other rights relating to pressure exchanger technology predating the order. And then if you look further in the order, it incorporates the settlement agreement which has similar language in it in its paragraph one, absolute transfer of all rights in, and it goes on to explain that, including number three, all other intellectual property and other rights relating to pressure exchanger technology predating this agreement. But that's referring to the technology related to the patent. No, sir, it isn't. It's in addition to that because what happened was, in this case, in the original lawsuit... So that covers all energy... all device... energy recovery devices? All of them? What we argued at the lower court, Your Honor, was that that language covered the proprietary manufacturing procedures that were in existence and developed by Mr. Haig and ERI at great cost and expense prior to 2001. So you were claiming, in effect, infringement? We weren't claiming infringement. We were claiming that part of the rights transferred were proprietary manufacturing procedures. Didn't the district judge have to construe in order to do this? No, sir, he didn't because the patents were a separate set of rights that were transferred. We made clear, and the court agreed, that this was not an argument about whether patents were violated. We presented evidence. The evidence was that we presented dealt with the manufacturing processes and procedures. We showed that it cost substantial amounts of money to come up with a from scratch manufacturing process to deal with the ceramic parts of these pressure exchangers. The patents themselves don't teach that. They deal with the, I will say, the technology of how a pressure exchanger works, not how the product is put together in terms of making ceramic pieces. We presented clear evidence, Your Honor, that at the time, pre-2001, the company approached this problem, there was nobody in the field who could do it. That Mr. Haig and our company, through a lot of trial and effort, came up with a proprietary method. Mr. Haig stated... Mr. Luna, if, what weight would you have us give to the California jury verdict? Your Honor, I think it's improper for you to put it into the record at this stage. I think that under federal rule of appellate... You'd like us to ignore it? Your Honor, I don't think, I think they're two different decisions. I really think you should review this case on the record that is before you. Of course we're reviewing it on the record before us, but this is one of those circumstances where there's a proceeding that is at a minimum related to this proceeding. What consideration should we give to that? Again, Your Honor, I think that you should review on the record that the district court had. It is often that courts disagree. But more importantly, the issues presented in California, although they may have all some of the same facts, were not the same. The court here was looking at whether the proprietary manufacturing processes had been used in violation of the order. The California case dealt with whether the employees in Mr. Hague violated California law, trade secret law, specifically. Now, I was not at that trial. I did not try that case, but that is my understanding of what occurred. And even though it came to a different conclusion, that is not grounds for reversing the district court who came to a different decision. Courts come to different decisions all the time. Your Honor, it is a different issue. What weight do you give to the two-year limitation in the settlement agreement? The two-year limitation was to keep Mr. Hague from participating in any fashion in energy recovery, which is a broader term than pressure exchanger. We put on evidence from our expert that there are many types of energy recovery devices, only one of which is a pressure exchanger. After those two years, he could come back into the energy recovery field, but he couldn't violate, as the district court said, what he transferred, the rights he gave away, in the order and settlement agreement. He could not, for example, if we changed it to a patent, he couldn't violate the patent just because the covenant not to compete expired. He couldn't violate a trade secret if the patent, if the covenant not to compete. So necessarily, his new patent, you're saying, infringes the prior patent. Is that right? We argued at the lower court, Your Honor, that it was not necessary to determine that. We do think it would practice at least some of the claims, but that's not the issue because we argued at the lower court that the violation of the contract and the order dealt with the proprietary manufacturing procedures. That's what we argued. The court specifically separated out any issue of patents and patent infringement. The court specifically separated out the issue of trade secrets, and it's in his order if you look at it. He says, look, I'm not looking at those two. I'm looking at what was argued here, and at the time that the transfer was made, there were very valuable rights in this proprietary manufacturing process. Your Honor, going back to... Now, when I look at the 2001 consent order, I don't find in it any express language that prohibits Hague from doing anything other than transferring over the patents and intellectual property, but the Fourth Circuit requires that in the case of General Motors Corporation that in order to uphold an order of contempt, there has to be specific detail and unequivocal command that the party has violated. Point to me in the 2001 consent order an unequivocal command that has been violated. It's two different things, Your Honor, just so I'm clear. 65D, which you're referring to, Rule 65D, talks about the injunction entered by the court, which, are you referring to the one that was entered by the lower court that is being appealed, or are you talking about this order in particular? Well, the injunction is based on the 2001 consent order, and the court says you violated the 2001 consent order. Show me where in the 2001 consent order that Hague is actually prohibited from doing anything other than transferring the property and the stock. By transferring the rights in the technology, i.e., the technology to manufacture this product, the proprietary manufacturer of this product, he was not to, once he transferred that, he wasn't to do it. It doesn't say that. It doesn't. All it says is you're going to transfer the property. It doesn't, but if I sell to you the right in my property, my home, for example, that doesn't mean I can come back and use my home. But if that happens, then you can proceed against me for another, under another cause of action, but, I mean, the consent order does not prohibit Hague from doing anything other than, you know, the transfer of the intellectual property and the payment of stocks and you get a picture and I get the truck, that type of thing. Well, it does more than that, though. By transferring those, the rights in that proprietary manufacturing process, he didn't get a license back to use it, and that's what the court found. The court said, you don't... There's got to be an unequivocal command. Where is that command that prohibits... It is... Yes, sir, Your Honor. It is an absolute transfer of all right, title, and interest, all rights in that proprietary manufacturing process. Did Hague do that? He did. It says it right here, number one, absolute transfer of all rights in, and it goes on and explains. But it doesn't say anything about prohibiting Hague from going on and engaging in commerce involving these type of devices. Well, Your Honor, it's our position, and the court, in its order, found that by absolutely transferring all of those rights, he did not have a license, he was not granted a license to go and to use. As for the injunction entered by the court that is being appealed today, it is an extension of this order. And as we argued in our briefs, Your Honor, the law provides that the court can be both reasonable and practical. I just don't see how it's an extension of the 2001 contempt order. Because injunction, the court said that defendant is prohibited. Again, now it's, now we find an unequivocal command for the first time. It says, through any person or entity from manufacturing and selling pressure exchangers or replacing parts for ERS pressure exchangers. And it goes on and prohibits from any, any type of activity in that regard. Yes, sir, Your Honor, it does. And I think that the reason that he did that and the reason that it's justified is this is a contempt proceeding. But the contempt order, according to what you're saying, and I think it's a fair reading, may be just applied to the exchangers involving in the technology that was transferred into ERI in 2001. But the injunction has language that prohibits him from taking, making, or selling any. Yes, sir, Your Honor. Not just the ones related to the, but any. Yes, sir. And, Your Honor, I may have been inarticulate in trying to explain what I think the judge was doing. The law allows him to exact more than just enforcing the prior order. And that's why there's a high standard for contempt. That is correct, Your Honor. It is, and we believe that we've met that standard. And in order to support that, there has to be something in the record that demonstrates a factual basis. But we don't have anything constrained in the patent so that it's infringed. I know he says, I'm not talking about patent infringement, but how do we know? Well, Your Honor, we didn't argue that the patent was infringed. We put on a lot of evidence concerning the proprietary manufacturing procedures. We put on evidence from an expert. We put on an expert from an individual who was available. There are no such findings. We're simply taking the judge's word for it. He says technology, the technology we argued about was that. It's clear from the record and from his opinion that what he is saying is, I'm not talking about patents because they say you've got to show infringement. I'm not talking about trade secrets because that's going on in California. I'm talking about the technology that they argued was violated. And that technology related to the patents that were transferred, the technology that was transferred under the 2001 consent order and settlement agreement. Did it relate to it broadly? Yes. But was it covered by them? It's different from them. It deals with manufacturing procedures. How do I take a raw piece of un-milled ceramic and turn it into a part that will work? The question there is that the manufacturing procedure that Haig was using was the same manufacturing procedure that he took from ERI back in 2001 under the consent agreement. It is the same pre-2001 manufacturing procedure that in fact was being used. On what basis does a district court then have to enjoin Haig from making or selling any pressure exchanger? Your Honor, two responses. If he merely enforced the order below, he would be leaving energy recovery in the exact same position. He had already ordered him not to do this and now we're right back to where we started. Is this the only top pressure exchanger device that exists? Aren't there others? This is the only pressure exchange... Well, ERI's and Mr. Haig's are the only two pressure exchanger devices. There are other energy recovery devices that work in a different fashion. And the reason for that is... Is he enjoined from selling or manufacturing any of those? No, he could make a Pelton wheel. He could make a DeWeer device. He could make the other devices that are out there if he didn't violate one of our patents or violate any of the rights that were transferred. Here he's making the exact same product with a rotor that spins around basically a spindle as opposed to not. But it is a product that is made in exactly the same way. And the issue of the workers from California was not that they took trade secrets, but it was that they knew how to do this technology, this proprietary manufacturing procedure. My time is up. I'm happy to answer further questions. Thank you, Mr. Pinona. Thank you, Your Honor. Mr. Sterba. Thank you, Your Honor. I will be brief. I would like to answer one question that I don't think Mr. Nunez directly answered from Judge Reyna, and that is there are many other types of pressure exchangers other than those made by Energy Recovery or Mr. Hogue and Isoberics. In fact, in the year 2001 when the parties entered into their settlement agreement, there were roughly 30 patents that had been issued at that time covering pressure exchanger. So for the court to enjoin Mr. Hogue from any activity relating to pressure exchanger broadly and not limited to the proprietary technology transfer we would submit would be clear error. Lastly, I would answer that the court cannot or should not ignore the decision of the California case because of the similarities between those two and in fact the district judge here relies on those same allegations as the basis for his opinion. That's the record we have and at a minimum the court can take judicial notice of that opinion, of that jury verdict. Is that now recorded? I'm sorry, Your Honor. Is that now recorded in Cal Reporter? I'm not certain whether it has been officially reported yet, Your Honor, but we can certainly look into that and could submit an additional supplemental authority. Unless the panel has further questions, I would gladly yield the balance of my time. Thank you, Mr. Skirby. That concludes our meeting. All rise.